James C. Shah (CA Bar No. 260435)
Kolin C. Tang (CA Bar No. 279834)
MILLER SHAH LLP
8730 Wilshire Blvd., Suite 400
Los Angeles, CA 90211
Phone: 866-540-5505
Fax: 866-300-7367
jcshah@millershah.com
kctang@millershah.com

Timothy N. Mathews (*pro hac vice* forthcoming)
Zachary P. Beatty (*pro hac vice* forthcoming)
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 W. Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
tnm@chimicles.com
zpb@chimicles.com

*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOSS KRIVIN, KIM GALLAGHER, ERIC HUEG, and BEVERLY PENNINGER<br><br>  Plaintiffs, individually and on behalf of all others similarly situated,<br><br>v.<br><br>PENSKE MEDIA CORPORATION,<br><br>  Defendant. | Case No. 2:25-cv-5803<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Moss Krivin, Eric Hueg, Kim Gallagher, and Beverly Penninger ("Plaintiffs"), by and through their undersigned counsel, bring this class action on behalf of themselves and all others similarly situated against Defendant, Penske Media Corporation ("Defendant" or "PMC"), for breach of contract and violations of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, for refusing to fulfill lifetime subscriptions to Rolling Stone magazine that Plaintiffs and the class member purchased. The following is alleged upon personal knowledge as to their own acts and experiences, and as to all other matters, upon information and belief, including the investigation conducted by Plaintiffs' counsel.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) and at least one Plaintiff, other Class members, and Defendant are domiciled in different states.

2.      The Court has personal jurisdiction over PMC because its principal place of business is within this District, and it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary.

3.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

4.      Plaintiff Krivin is a citizen of California residing in Beverly Hills.

5.      Plaintiff Gallagher is a citizen of Pennsylvania residing in McAdoo.

6.      Plaintiff Hueg is a citizen of California residing in San Clemente.

7.      Plaintiff Penninger is a citizen of Florida residing in Daytona Beach Shores.

8.      Defendant, PMC, is incorporated under the laws of the State of Delaware and maintains its principal place of business at 11355 W Olympic Boulevard, Los Angeles, CA 90064. PMC is the owner and publisher of Rolling Stone Magazine.

## FACTUAL ALLEGATIONS

9.      Founded in 1967, to say that Rolling Stone magazine is iconic is an understatement. Rolling Stone is renowned not just for its coverage of rock music, politics, and pop culture by authors that have included Hunter S. Thompson, Cameron Crowe, and Rob Sheffield, but also for its iconic art and photography by artists that have included Annie Liebowitz, Mark Seliger, Matthew Rolston, Jay Blakesburg, David LaChappelle, Richard Avedon, Herb Ritts, Baron Wolman, and others.[1]

10.      In addition to in-depth reporting of cultural and political news, each issue of Rolling Stone magazine also emphasizes exceptional, high-resolution art and photography printed in vibrant color on thick, high-quality, glossy paper.

11.      Photography and artwork have been and continue to be a centerpiece of Rolling Stone's marketing. For example, one current advertisement touts: "Iconic Photography From John Lennon to Janelle Monae, Rolling Stone continues to deliver head-turning original photography of the moment's top personalities."[2]

12.      Many Rolling Stone covers have become iconic in their own right, including covers that featured John Lennon and Yoko Ono (a photo taken by Annie Leibowitz just hours before John's death), David Bowie, Michael Jackson, Beastie Boys, and countless others. Indeed, Rolling Stone has sold hundreds of thousands of copies of mere compilations of its covers and other artwork featured in the magazine. E.g., *Rolling Stone 1,000 Covers: A History of the Most Influential Magazine in Pop Culture* (2006); *Rolling Stone: The Complete Covers, 1967-1997* (1998); *Rolling Stone: The Illustrated Portraits* (Gus Wenner ed., 2020).

---

[1] *See* Rolling Stone: The Photo Issue, https://www.rollingstone.com/interactive/the-photo-issue/.

[2] Rolling Stone: Subscribe, https://www.rollingstone.com/subscribe.

13.      Given Rolling Stone's emphasis on art and photography, and the high-quality and attention to detail of its print magazine, it is no surprise that tactile and visual properties of the physical magazine are important to subscribers, including Plaintiffs.[3] Furthermore, print editions of Rolling Stone have substantial display value and collectability. There is an entire market dedicated to collecting and selling print Rolling Stone magazines. Tens of thousands of copies are re-sold by collectors every year.

14.      For most of its history, one of Rolling Stone's primary sources of revenue was print advertising. Because advertisers will pay more to advertise in publications with wide circulation, maintaining a large number of subscribers was critical to Rolling Stone's business.

**Defendant's Breach of Contract**

15.      In order to boost its circulation, and therefore bolster its advertising revenue, in the early 2000's—from at least August 2003 through July 2005—Rolling Stone advertised and offered "lifetime" subscriptions to the magazine. For $99, subscribers were promised printed copies of every published Rolling Stone magazine delivered to their homes for their entire lives. For example, one advertisement  stated, "The longer you live, the more you screw us over." *See infra*, paragraph 20.

//
//
//
//
//
//
//

---

[3] *See, e.g.*, Scott Nover, *When a Lifetime Subscription Contract Isn't for Life*, Slate (June 3, 2024), https://slate.com/business/2024/06/rolling-stone-lifetime-subscription-canceled-reactions-legal-issues.html (quoting a lifetime subscriber who stated "the photography has been a hallmark of [Rolling Stone's] issues from the very beginning.").

PLAINTIFF'S CLASS ACTION COMPLAINT

16.    Plaintiffs and other Class members accepted Rolling Stone's offer, paid the requisite sums, and, thereby, formed valid binding contracts for lifetime subscriptions to Rolling Stone magazine. And, for at least two decades, Plaintiffs and other Class members did receive print copies of each issue of the magazine. The mailing labels affixed to the magazine documented and verified their lifetime subscription status. For example, Plaintiff Hueg's label indicated that his subscription was valid until at least April 2055:



17.    In or around May 2024, however, Defendant announced that it will no longer comply with its lifetime subscription contracts. Even though Rolling Stone magazine continues to be published and mailed to all other subscribers, PMC announced that it will no longer deliver printed copies of the magazine to its lifetime subscribers. Instead, PMC will provide them only an "e-Edition" of the magazine, which is essentially like a PDF of the magazine, thereby depriving them of the primary benefit of the contract to which they are entitled: an actual printed copy of the magazine.

//
//
//
//
//
//
//

PLAINTIFF'S CLASS ACTION COMPLAINT

18.    The communication (which was sent via email, not mailed, to subscribers and, therefore, many of them never actually received or read it) stated:



**RollingStone**

Dear Rolling Stone Subscriber:

Thank you for being a loyal reader of Rolling Stone. We are transitioning the delivery of Rolling Stone's lifetime subscribers to a digital format. Your final printed copy will be the June 2024 issue.

The e-Edition format is an exact replica of the magazine you can read on your computer, tablet, or phone. A reminder email will be sent to you every time a new issue is published. In addition to access to the current issue, you will have access to a library of issues for the past five years.

If you need to update your email address with us, or you wish to stop receiving Rolling Stone, please contact customer service at rollingstone.com/customerservice or customerservice@rollingstone.com.

Sincerely,

David Roberson SVP, Subscriptions

Privacy Policy | Terms of Use | Do Not Sell My Information | Customer Service

19.    The contract between Rolling Stone and the Class members was for a lifetime subscription to the actual magazine, not an electronic copy. That indisputable fact is verified by, among other things, the terms of the advertising, the course of performance, the verification on the mailing labels, and the fact that the so-called "e-Edition" did not exist when Class members entered their lifetime subscription contracts.

20.    For instance, the offer placed in the print magazine stated: "we've come up with a radical new way to get **this magazine**: a *Lifetime* Subscription to Rolling Stone – and for less than what you'd spend **buying it on the newsstand** this year alone!" (italics original, bold added). The full page offer is set forth below:

PLAINTIFF'S CLASS ACTION COMPLAINT



21.    On its website, Rolling Stone displayed the lifetime subscription offer alongside images of the print magazine, and in the same section of the website, referred to print issues, e.g., "Get 4 issues free!" and "Back Issues":[4]

---

[4] Internet Archive, *RollingStone.com*,
https://web.archive.org/web/20031012155648/http://www.rollingstone.com/ (top image,

PLAINTIFF'S CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25





26   as of Oct. 12, 2003); Internet Archive, *RollingStone.com*,
27   https://web.archive.org/web/20031216154402/https://www.rollingstone.com/ (middle
     image, as of Dec. 16, 2003); Internet Archive, *RollingStone.com*,
28   https://web.archive.org/web/20050301002307/http://rollingstone.com:80/ (bottom
     image, as of March 1, 2005).

PLAINTIFF'S CLASS ACTION COMPLAINT

22.     Moreover, Rolling Stone continues to publish and deliver a physical copy of the magazine to every subscriber other than its lifetime subscribers. Clearly, Rolling Stone could not, consistent with its contractual obligations, unilaterally decide to send only an electronic copy of the magazine to a subscriber who purchased a one-year subscription to the print magazine. It makes no difference that the Class members purchased a lifetime subscription.

23.     Defendant has materially breached its lifetime subscription contracts because an electronic copy of Rolling Stone magazine is materially different from the promised print copy. In addition to the obvious tactile nature of a print copy with large, color glossy pages, a print copy exists in physical space, can be owned forever, and can be traded, collected, or resold. Print copies are collectible and have real value, whereas the e-Editions are ephemeral, non-exclusive, and not collectible.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

PLAINTIFF'S CLASS ACTION COMPLAINT

24.    Moreover, the e-Editions that PMC sends are essentially like an unwieldy PDF version of the magazine. They are no substitute for a real physical magazine. For example, below is one page from an e-Edition emailed to Plaintiff Hueg—even with a blown-up size, it would be difficult to read:



25.    It should also be noted that the e-Edition is *not* a subscription to RollingStone.com, which is an entirely separate subscription service. Instead, the e-Edition is merely an ancillary feature that Rolling Stone provides free with every print subscription. Indeed, the cover emails transmitting the e-Editions to Plaintiffs and Class members state: "The e-Edition is an exact online replica of the magazine, *included with your print subscription*." (emphasis added).



26.    In short, receipt of e-Editions is not what Plaintiffs and the Class members bargained for—they bargained for a lifetime subscription to print issues.

27.    Rolling Stone has breached all its lifetime subscription contracts. As a result of PMC's breach of contract, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

**Defendant's Violations of the CLRA**

28.    At the same time, PMC's (mis)representations in connection with its breaches of contract with Plaintiffs Krivin and Hueg and California Subclass (defined below) members constitute violations of the CLRA.

29.    The CLRA prohibits "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Cal. Civ. Code. § 1770(a)(15).

30.    PMC falsely represented to Plaintiffs Krivin and Hueg and California Subclass members that the "e-Edition" of the magazine satisfied the representations made

with the lifetime subscriptions. For the reasons detailed above, the "e-Edition" of the magazine does not satisfy such representations, and PMC's misguided attempts to mislead Plaintiffs and Class members as to its obligations to provide print copies of each issue of the magazine constitute violations of the CLRA.

## **PLAINTIFFS' EXPERIENCES**

**Plaintiff Gallagher**

31.    On March 22, 2004, Plaintiff Gallagher entered a lifetime subscription contract by filling out and sending in a postcard, which was attached to a prior print edition of the magazine. Plaintiff Gallagher paid $99 for her lifetime subscription.

32.    At the time she entered the contract, Plaintiff Gallagher understood that she would receive print editions of Rolling Stone for the duration of her life. The receipt of print editions of Rolling Stone was a material term of Plaintiff Gallagher's lifetime subscription contract and formed the basis of her bargain. It was also important to Plaintiff Gallagher that she could collect the printed, physical editions of Rolling Stone.

33.    Pursuant to her subscription, Rolling Stone and PMC sent Plaintiff Gallagher a print version of each Rolling Stone edition from 2004 through June 2024.

//
//
//
//
//
//
//
//
//
//
//
//

PLAINTIFF'S CLASS ACTION COMPLAINT

34.     On the label of each print magazine Plaintiff Gallagher received, Rolling Stone represented that her subscription to the print edition was valid until at least December 2059.



35.     Plaintiff Gallagher did not receive any notification from PMC that it was breaching the contract and would only send the e-Edition going forward.

36.     In August 2024, Plaintiff Gallagher sent two emails to Rolling Stone customer service inquiring about her subscription and why she had not received her recent print editions. Rolling Stone did not reply.

37.     Following up on her emails, in April 2024, Plaintiff Gallagher called Rolling Stone customer service. The customer service representative informed Plaintiff Gallagher that Rolling Stone had changed her subscription to receive the e-Edition only. Plaintiff Gallagher demanded that Defendant provide her print editions for the past nine months and comply with its contract going forward. The representative informed her that, solely as a courtesy, she would again receive print editions, but made no promise of continued future compliance.

//

PLAINTIFF'S CLASS ACTION COMPLAINT

38.     Plaintiff Gallagher then logged into her account online and found that where her subscription-information page previously stated that she would receive 624 print editions, PMC had unilaterally changed it to state that she would only receive 36 online e-Editions.

39.     After her April call to Rolling Stone, no print editions came. So, on May 29, 2025, Plaintiff Gallagher filed a complaint with the Better Business Bureau ("BBB") stating that PMC had unilaterally changed her subscription to e-Editions (possibly to only 36) and that she desired that PMC honor her lifetime subscription contract entitling her to print editions.

40.     After having contacted Rolling Stone customer service multiple times and filing a BBB complaint, Plaintiff Gallagher received a print edition of Rolling Stone magazine for the month of June 2025, but never received the missing back copies, and Rolling Stone has not acknowledged its contractual obligation to continue delivering print copies for her life. Instead, it has only extended what it calls a "courtesy," which is unenforceable and of unknown duration.

41.     Plaintiff Gallagher did not accept, and has not accepted, any attempt by PMC to unilaterally amend material terms of her lifetime subscription contract.

42.     Although PMC emails Plaintiff Gallagher an e-Edition of Rolling Stone, the e-Edition is not the same as the print edition and is not what Plaintiff Gallagher bargained or paid for. In fact, Plaintiff Gallagher has not read a single e-Edition copy because she does not like them and places no value on them.

43.     As a result of PMC's breach of her lifetime subscription contract, Plaintiff Gallagher has lost the benefit of her bargain and has suffered damages.

**Plaintiff Hueg**

44.     Prior to becoming a lifetime subscriber, Plaintiff Hueg was a monthly subscriber to Rolling Stone. In or about early 2005, Plaintiff Hueg received a copy of Rolling Stone that included the lifetime subscription offer with a tear-off postcard to

subscribe. In or about May 2005, Plaintiff Hueg accepted Rolling Stone's offer of a lifetime subscription to its print magazine by returning the postcard and paying $99.

45.    At the time he accepted the offer, Plaintiff Hueg understood that he would receive print editions of Rolling Stone for the duration of his life. Receipt of print editions of Rolling Stone was a material term of Plaintiff Hueg's lifetime subscription contract and formed the basis of his bargain.

46.    Pursuant to his subscription, Rolling Stone and PMC sent Plaintiff Hueg a print version of each Rolling Stone edition from 2005 through June 2024.

47.    On the label of each print magazine Plaintiff Hueg received, Rolling Stone represented that his subscription to the print edition was valid until at least April 2055.

48.    In May 2024, however, PMC sent Plaintiff Hueg the communication (*supra* ¶ 18) informing him that the June 2024 edition would be the last print version of Rolling Stone that he would receive pursuant to his lifetime subscription.

49.    Plaintiff Hueg did not accept, and has not accepted, any attempt by PMC to unilaterally amend material terms of his lifetime subscription contract.

50.    Between June 2024 and June 2025, PMC did not send Plaintiff Hueg print editions of Rolling Stone.

51.    On April 1, 2025, Plaintiff Hueg, through his undersigned counsel, sent a demand letter notifying PMC of its breach of contract and violations of the CLRA. In response, PMC denied that it had any contractual obligation to send print copies of Rolling Stone, but it offered to continue sending copies to Plaintiff Hueg as an unenforceable "courtesy" with no commitment as to duration. PMC likewise denied that it had violated the CLRA or any other California law.

52.    As a result of PMC's breach of his lifetime subscription contract, Plaintiff Hueg has lost the benefit of his bargain and has suffered damages.

**Plaintiff Krivin**

53.    Prior to purchasing his lifetime subscription, Plaintiff Krivin had been a long-time subscriber to Rolling Stone magazine, as early as 1986. In or about July 2005,

Plaintiff Krivin received a print edition of Rolling Stone and attached to it was an offer for the lifetime subscription, and to enroll, he needed only fill out a postcard and return it to Rolling Stone. On or about July 8, 2005, Plaintiff Krivin accepted Rolling Stone's offer of a lifetime subscription to its print magazine by returning the postcard. Plaintiff Krivin accepted the lifetime subscription offer by filling out and sending in the postcard. Plaintiff Krivin paid $99 for his lifetime subscription.

54.    Plaintiff recalls that Rolling Stone used the line, "The longer you live, the more you screw us over," as a marketing slogan for the lifetime subscription offer.

55.    At the time he accepted the offer, Plaintiff Krivin understood that he would receive print editions of Rolling Stone for the duration of his life. Receipt of print editions of Rolling Stone was a material term of Plaintiff Krivin's lifetime subscription contract and formed the basis of his bargain.

56.    Pursuant to his subscription, Rolling Stone and PMC sent Plaintiff Krivin a print version of each Rolling Stone edition from 2005 through June 2024.

57.    On the label of each print magazine Plaintiff Krivin received, Rolling Stone represented that his subscription to the print edition was valid until at least December 2059.



//
//

58.     In May 2024, however, PMC sent Plaintiff Krivin the communication (*supra* ¶ 28) informing him that the June 2024 edition would be the last print version of Rolling Stone that he would receive pursuant to his lifetime subscription.

59.     Plaintiff Krivin did not accept, and has not accepted, any attempt by PMC to unilaterally amend material terms of his lifetime subscription contract.

60.     After June 2024, PMC has not sent Plaintiff Krivin print editions of Rolling Stone.

61.     Although PMC instead emails Plaintiff Krivin an e-Edition of Rolling Stone, the e-Edition is not the same as the print edition and is not what Plaintiff Krivin bargained or paid for.

62.     As a result of PMC's breach of his lifetime subscription contract, Plaintiff Krivin has lost the benefit of his bargain and has suffered damages.

**Plaintiff Penninger**

63.     Prior to purchasing her lifetime subscription, Plaintiff Penninger had been a long-time subscriber to Rolling Stone magazine, as early as the 1980s. In or about August 2003, Plaintiff Penninger received a print edition of Rolling Stone and attached to it was an offer for the lifetime subscription, and to enroll, she needed only fill out a postcard and return it to Rolling Stone. On or about August 14, 2003, Plaintiff Penninger accepted Rolling Stone's offer of a lifetime subscription to its print magazine by returning the postcard. Plaintiff Penninger paid $99 for her lifetime subscription.

64.     At the time she accepted the offer, Plaintiff Penninger understood that she would receive print editions of Rolling Stone for the duration of her life. Receipt of print editions of Rolling Stone was a material term of Plaintiff Penninger's lifetime subscription contract and formed the basis of her bargain.

65.     Pursuant to her subscription, Rolling Stone and PMC sent Plaintiff Penninger a print version of each Rolling Stone edition from 2003 through June 2024.

66.     On the label of each print magazine Plaintiff Penninger received, Rolling Stone represented that his subscription to the print edition was valid until at least 2059.

PLAINTIFF'S CLASS ACTION COMPLAINT

67.    In May 2024, however, PMC sent Plaintiff Penninger the communication (*supra* ¶ 18) informing her that the June 2024 edition would be the last print version of Rolling Stone that she would receive pursuant to her lifetime subscription.

68.    Plaintiff Penninger did not accept, and has not accepted, any attempt by PMC to unilaterally amend material terms of her lifetime subscription contract.

69.    In fact, within a few days of receiving the May communication, Plaintiff Penninger emailed Rolling Stone customer service to request that it honor her contract and send her print subscriptions. Rolling Stone did not reply. Plaintiff Penninger then sent an additional three or four emails to Rolling Stone. Rolling Stone customer service did not respond to any. Plaintiff Penninger also attempted calling Rolling Stone customer service at least three times. Rolling Stone did not respond to her calls.

70.    After June 2024, PMC has not sent Plaintiff Penninger print editions of Rolling Stone.

71.    Although PMC instead emails Plaintiff Penninger an e-Edition of Rolling Stone, the e-Edition is not the same as the print edition and is not what Plaintiff Penninger bargained or paid for.

72.    As a result of PMC's breach of her lifetime subscription contract, Plaintiff Penninger has lost the benefit of her bargain and has suffered damages.

## CLASS DEFINITIONS AND ALLEGATIONS

73.    Plaintiffs brings this lawsuit under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) as representatives of the:

**Nationwide Class:**
All persons within the United States who purchased a lifetime subscription to Rolling Stone Magazine.

**California Subclass:**
All persons within California who purchased a lifetime subscription to Rolling Stone Magazine.

**Florida Subclass:**

All persons within Florida who purchased a lifetime subscription to Rolling Stone Magazine.

**Pennsylvania Subclass:**
All persons within Pennsylvania who purchased a lifetime subscription to Rolling Stone Magazine.

74. The above classes are collectively referred to as the Class. The California Subclass and the Pennsylvania Subclass are referred to as the State Subclasses.

75. The following persons and entities are excluded from the Class: PMC and its officers, directors, employees, subsidiaries, and affiliates; all judges assigned to this case and any members of their immediate families; and the parties' counsel in this litigation.

76. Plaintiffs reserve the right to modify, change, or expand the Class definition, including proposing additional subclasses, based upon discovery and further investigation.

77. **Numerosity.** PMC sold at least hundreds of thousands of lifetime subscriptions. Members of the Classes are widely dispersed throughout the country. Class members are so numerous that joinder is impracticable.

78. **Typicality.** Plaintiffs' claims are typical of Class members' claims. Plaintiffs and the Class members all sustained injury as a direct result of Defendant's practice of regularly failing to honor the lifetime subscriptions.

79. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to the interests of other Class members and are committed to vigorously prosecuting this case. Plaintiffs have retained competent counsel experienced in the prosecution of consumer protection class actions involving breaches of contract and misleading, deceptive, and unfair marketing practices.

80. **Commonality and Predominance.** Questions of law and fact common to the Class members predominate over questions that may affect only individual Class

PLAINTIFF'S CLASS ACTION COMPLAINT

members because PMC acted on grounds generally applicable to the Class as a whole. Questions of law and fact common to the Class include:

    a.  Whether Defendant offered to Plaintiffs and Class members lifetime subscriptions to Rolling Stone;

    b.  Whether Plaintiffs and Class members accepted Defendant's offer for lifetime subscriptions to Rolling Stone;

    c.  Whether Defendant breached its agreements with Plaintiffs and Class members by failing to honor the lifetime subscriptions by ceasing to send printed copies to them;

    d.  Whether Defendant's representations that the "e-Edition" of the magazine satisfied its obligations in connection with its lifetime subscription representations to Plaintiffs Krivin and Hueg and California Subclass members violated the CLRA;

    e.  Whether Plaintiffs and Class members are entitled to equitable relief, including restitution and injunctive relief; and

    f.  Whether Plaintiffs and Class members are entitled to damages or other monetary relief and, if so, in what amount.

81. **Superiority**. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of PMC's financial resources, Class members are not likely to pursue legal redress individually for the violations detailed in this complaint. Individualized litigation would significantly increase the delay and expense to all parties and to the Court and would create the potential for inconsistent and contradictory rulings. By contrast, a class action presents fewer management difficulties, allows claims to be heard which would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

PLAINTIFF'S CLASS ACTION COMPLAINT

82.    Class certification is also appropriate under Rules 23(b)(1) and/or (b)(2) because:

a.    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for PMC;

b.    The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

c.    PMC acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the members of the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract
### Individually and on Behalf of the Nationwide Class or, in the Alternative, the State Subclasses

83.    Plaintiffs reallege and incorporate by reference all preceding and succeeding allegations as though fully set forth herein.

84.    Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class against PMC as there are no true conflicts among the states' laws of breach of contract. In the alternative, Plaintiffs bring this claim on behalf of the State Subclasses.

85.    PMC, through its predecessors, offered a lifetime subscription to print editions of Rolling Stone magazine for a one-time fee of $99. In other words, the subscriber would be entitled to print copies of each Rolling Stone edition for the life of the subscriber.

86.    Plaintiffs accepted the offer.

87.     Plaintiffs paid $99 for their lifetime subscriptions.

88.     The provision of Rolling Stone magazine in print was a material term of the contract and a key factor in Plaintiffs' decisions to purchase the lifetime subscriptions. In fact, that specific promise and understanding induced Plaintiffs to enter into the agreement.

89.     In May 2024, Defendant unilaterally attempted to modify its agreement with Plaintiffs by informing them that June 2024 would be the last time that they received their printed edition of Rolling Stone magazine for which they bargained.

90.     At no time did Plaintiffs agree to modify any term of their lifetime subscription contracts.

91.     In July 2024, Defendant breached the agreements with Plaintiffs by failing to provide them with print editions of Rolling Stone.

92.     Because of Defendant's repudiation of its obligations under the lifetime subscription contracts, notice of breach was not required. In any event, Plaintiffs notified Defendant of its breach of the lifetime subscription contracts as to Plaintiffs and all Class Members, but Defendant has failed to recognize its obligations under the contracts.

93.     As a direct and proximate result of Defendant's breach of the lifetime subscription contracts, Plaintiffs have not realized the benefit of their bargain and have suffered damages.

94.     Accordingly, Plaintiffs seek compensatory damages, expectancy damages, specific performance requiring PMC to honor its obligations under the lifetime subscription contracts, and/or rescission of the contract and refund of the amounts paid.

## COUNT II
### Violation of the California Consumers Legal Remedies Act
### (Cal. Civ. Code § 1750, *et seq.*)
### Individually and on Behalf of the California Subclass

95.     Plaintiffs Krivin and Hueg reallege and incorporate by reference all preceding and succeeding allegations as though fully set forth herein.

96.     Plaintiffs Krivin and Hueg bring this cause of action on behalf of themselves and the California Subclass members against PMC.

97.     The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal Civ. Code § 1770.

98.     The Rolling Stone magazines are "goods" as defined in Cal. Civ. Code § 1761(a).

99.     Plaintiffs Krivin and Hueg and the California Subclass members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs Krivin and Hueg, the California Subclass members, and Defendant are "persons" as defined in Cal. Civ. Code § 1761(c).

100.    Plaintiffs Krivin and Hueg and the California Subclass members were deceived by Defendant's representations that the "e-Edition" of the magazine satisfied Defendant's obligations to Plaintiffs Krivin and Hueg and the California Subclass members under the lifetime subscriptions.

101.    Defendant's conduct, as described herein and above, violated and continues to violate the CLRA. In particular, Cal. Civ. Code. § 1770(a)(15) prohibits a person from "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

102.    Plaintiffs Krivin and Hueg and the California Subclass members have suffered injury in fact and actual damages resulting from Defendant's misrepresentations because they did not receive print copies of the Rolling Stone magazine as Defendant was obligated to provide in accordance with its previous representations to them.

103.    Defendant knew, should have known, or was reckless in not knowing that "e-Editions" of the magazine did not satisfy its obligations to provide print copies of the magazine in accordance with its previous representations to Plaintiffs Krivin and Hueg and the California Subclass members.

PLAINTIFF'S CLASS ACTION COMPLAINT

104.   Plaintiff Hueg provided Defendant notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a) on behalf of himself and similarly situated individuals. The notice was sent to Defendant on April 1, 2025, which Defendant rejected on or about April 25, 2025.

105.   Plaintiffs Krivin and Hueg and the California Subclass members' injuries were proximately caused by Defendant's fraudulent and deceptive business practices.

106.   Therefore, Plaintiffs Krivin and Hueg and the California Subclass members are entitled to monetary and injunctive relief and attorneys' fees under the CLRA.

107.   Plaintiffs' CLRA venue declaration, pursuant to Cal. Civ. Code § 1780(d), is attached hereto as Exhibit A.

## PRAYER FOR RELIEF

108.   WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court certify the proposed Class, designate Plaintiffs as Class representatives, appoint the undersigned as Class Counsel, and enter an Order providing for the following:

a.   An order certifying the proposed Class, appointing Plaintiffs as class representatives of the proposed Class and his undersigned counsel;

b.   A judgment awarding Plaintiffs and Class members appropriate monetary relief, including actual damages, restitution, and disgorgement;

c.   A judgment awarding Plaintiffs and Class members appropriate injunctive relief or specific performance, including reinstatement of print copies under their lifetime subscription contracts;

d.   An Order requiring PMC to pay both pre- and post-judgement interest on any amounts awarded;

e.   An award for reasonable attorneys' fees and costs as permitted by law; and

f.   An Order entering such other relief as the Court may deem just and proper.

1

## <u>**JURY TRIAL DEMAND**</u>

2

3
Plaintiffs hereby demand a trial by jury for all claims so triable.

4

5
Dated: June 25, 2025

6
Respectfully submitted,

7
*By: /s/ James C. Shah*
James C. Shah (SBN 260435)

8
Kolin C. Tang (SBN 279834)

9
**MILLER SHAH LLP**
155 Montgomery, 6th Floor

10
San Francisco, CA 94104

11
Phone: 866-540-5505
Fax: 866-300-7367

12
jcshah@millershah.com

13
kctang@millershah.com

14
Timothy N. Mathews (*pro hac vice* forthcoming)

15
Zachary P. Beatty (*pro hac vice* forthcoming)

16
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

17
361 West Lancaster Avenue

18
Haverford, PA 19041
Phone: 610-642-8500

19
Fax: 610-649-3633

20
tnm@chimicles.com
zpb@chimicles.com

21

22
*Counsel for Plaintiffs and the Putative Class*

23

24

25

26

27

28

PLAINTIFF'S CLASS ACTION COMPLAINT